Oscar L. **GRUBER**, Raymond **Shatz** and **Larry Greenstein**, suing on behalf of themselves and all others similarly situated

v.

**PRICE WATERHOUSE.**

Civ. A. No. 86–3976.

United States District Court, E.D. Pennsylvania.

Aug. 26, 1988.

Anthony J. Bolognese, Leonard Barrack, Richard B. Dannenberg, Philadelphia, Pa., Jill Raskin, New York City, for plaintiffs.

John G. Harkins, Patricia L. Freeland, Philadelphia, Pa., Rodman W. Benedict, New York City, for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendant, an accounting firm, has moved for summary judgment in this class-action securities case on the ground that plaintiffs' claims against it are barred by the statute of limitations. The motion involves consideration of the retroactivity of the Third Circuit's *en banc* decision, *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1550 (3d Cir.1988), and when plaintiffs' claims accrued.

On July 3, 1986, plaintiffs, a class of shareholders of the common stock of AIA Industries, Inc., brought this action against Price Waterhouse for its role in the preparation of audited financial reports and a comfort letter in connection with the July 21, 1983, initial public offering of AIA stock. They assert claims pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k; Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b) and rule 10b–5; and common law fraud and deceit. Simply stated, plaintiffs allege that Price Waterhouse knew of deficiencies in AIA's accounting procedures yet recklessly failed to discover or disclose a variety of fraudulent transactions that materially overstated the financial picture of AIA in the prospectus accompanying the public offering. In the complaint, plaintiffs identify those allegedly fraudulent transactions as primarily involving loan balances, account receivables, and other transactions between AIA and a major customer, ITG, Inc., and its sole shareholder and principal officer, Roy Goldberg.

In May, 1984, several class action complaints were filed against AIA, some of its officers and directors, and the stock underwriters arising from the July 21, 1983, public offering. In the offering materials, AIA reported that it was primarily engaged in providing charter and scheduled airline service for the gaming industry in Atlantic City, New Jersey.[1] The company stated that its primary customers were several casinos and travel groups and that it occupied a dominant position in this growing market. While AIA had historically incurred losses, the audited financial reports disclosed a decrease in losses[2] as of November, 1982, and the unaudited report for the four month period ending March 31, 1983, showed net income in excess of $718,000, with operating income of $371,378.

After the public offering, AIA announced that it was undergoing a change in its business to a predominantly scheduled air carrier with a significant de-emphasis in gaming charters. Commencing with the last quarter of fiscal 1983, the company began to incur substantial losses attributed to expenditures for the establishment of scheduled airline service. For fiscal year 1983 ending November 30, 1983, AIA announced a loss from operations of $8,948,363 and a loss for the fourth quarter of 1983 totalling $13,399,000. It was later disclosed that AIA had not paid excise and employment taxes for the fourth quarter. In July, 1984, AIA and its subsidiaries filed for reorganization under Chapter 11 of the Bankruptcy Code.

In their complaints against the company, its officers and directors, and the underwriters of the public offering, plaintiffs primarily alleged that defendants fraudulently failed to disclose in the public offering materials the transformation of AIA from a gaming charter airline to a scheduled air carrier. Plaintiffs also made general allegations that the financial informa-

---

1. AIA was a holding company for several subsidiaries of which American International Airways, Inc., was the principal operating subsidiary. For convenience, "AIA", as used in this opinion, will include the parent company and its subsidiaries.

2. The March 31, 1982 consolidated statement showed a loss from operations of $948,843 and a net loss of $1,403,741. The November 30, 1982 statements showed that both losses were $204,706.

tion in the prospectus was false or misleading principally for failing to account for the expenses incurred with the change of business. The individual class action complaints were eventually consolidated into *In Re AIA Industries, Inc. Securities Litigation*, Master File No. 84–2276 (E.D.Pa.).

Once a statute of limitations defense is pleaded, plaintiffs bear the burden of showing that their complaint was timely filed. *See e.g. Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978). Defendant, however, in moving for summary judgment, must show that accepting all facts of record and inferences reasonably drawn from the facts in the light most favorable to plaintiffs, there are no genuine questions of material fact. *E.g. Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200 (3d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 730, 98 L.Ed. 2d 679 (1988). In the context of the statute of limitations defense, where contrary inferences may reasonably be drawn from the facts which are material to when the cause of action accrued, defendants bear a heavy burden of showing that the claims are untimely as a matter of law. *See e.g. Van Buskirk v. Carey Canadian Mines Ltd.*, 760 F.2d 481, 487 (3d Cir.1985); *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir.), *cert. denied*, 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984).

I.  Governing Legal Standards

A.  *Applicable Statute of Limitations*

■ The parties agree that plaintiffs' common law claim is governed by a two-year statute of limitations from the date plaintiff knew or should have known of the injury and its cause. *See* 42 Pa. Cons.Stat. Ann. 5524(7); *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268 (3d Cir.1987). In contrast, the section 11 claim is barred if plaintiffs knew or should have known by the exercise of reasonable diligence of the untrue statements or omissions more than one year before July 3, 1986. 15 U.S.C. § 77m.[3] The parties disagree as to the applicable limitations period for the section 10(b) and rule 10b–5 claims.

In an *en banc* decision, the Third Circuit recently held that the limitations period found in the Securities Act of 1933, which applies to the section 11 claim, also governs the implied causes of action under section 10(b) and rule 10b–5. *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1550 (3d Cir.1988). Prior to *Data Access*, the court of appeals had employed a case by case approach to this question which required a court

> to examine each contention of a federal securities complaint with great particularity to determine whether the state blue sky statute tracks the particular federal claim, and if not, to determine claim-by-claim which other state limitations period will apply depending upon the resemblance between the precise federal claim and those based in state or common law actions.

*Id.* at 1541. *See Biggans v. Bache Halsey Stuart Shields, Inc.*, 638 F.2d 605 (3d Cir. 1980); *Roberts v. Magnetic Metals Co.*, 611 F.2d 450 (3d Cir.1979). Defendant now advocates a retroactive application of *Data Access* which plaintiffs oppose.

Generally, the law applied is the law in force on the date the case is decided. Whether a decision that would legally and factually control a case should only be applied prospectively requires consideration of three factors:

1.  Whether the decision to be applied establishes a new *principle of law*, either by overruling clear past precedent on which litigants may have reasonably relied, or decides an issue of first impression that was not clearly foreshadowed.

2.  Whether retroactive application will further or retard the rule's operation as determined by an examination of the history, purpose, and effect of the rule.

3.  Whether retroactive application will produce substantially inequitable results. *Chevron Oil Co. v. Huson*, 404 U.S. 97,

---

**3.** Section 77m also creates an outside limit of three years after the securities were offered to the public. As the first public offering of AIA stock occurred on July 21, 1983, this provision does not come into play.

106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); *Hill v. Equitable Trust Co.,* 851 F.2d 691 (3d Cir.1988). In *Hill,* the court applied *Data Access* retroactively after finding that the first and third factors did not favor limiting the *en banc* decision to prospective application.[4] In this particular case, however, I conclude that the first and third factors require prospective application of *Data Access.* Thus, I will apply a two-year statute of limitations to plaintiffs' section 10(b) and rule 10b–5 claims.

Under the first factor, prior precedent must be " 'sufficiently clear that a plaintiff could have reasonably relied upon it in delaying suit, a criteria that was not met where the law was erratic and inconsistent.' " *Hill,* at 696 (quoting *Fitzgerald v. Larson,* 769 F.2d 160 (3d Cir.1985)). Here, unlike *Hill,* there was clear precedent, directly on point, on which plaintiffs could reasonably have relied. In 1981, a unanimous panel of the Third Circuit, on the basis of *Biggans,* summarily held that in Pennsylvania, section 10(b) and rule 10b–5 claims by a purchaser of a security against an accountant were governed by the Pennsylvania common law statute of limitations for fraud. *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 191–92 (3d Cir.1981). In *Hill,* to the contrary, the court found the law unsettled because of the lack of consensus as to the proper application of the *Roberts* and *Biggans* analysis to different factual scenarios, which as the district court had previously commented in a related action, made it "difficult to predict what effect these opinions hold *for the circumstances posed by the present complaint." Hill v. Der,* 521 F.Supp. 1370, 1382–83 (D.Del. 1981) (emphasis added). The Third Circuit found that this district court decision:

> placed these very plaintiffs on notice that, at least as of their filing date, the law in the circuit on this issue was in ferment. Although the majority opinions in *Biggans* and *Roberts* were precedential, the factual situations in each case left considerable room for variation as *Der* demonstrated. Clear holdings on which plaintiffs could reasonably rely, as

in *Al–Khazraji* [*v. St. Francis College,* 784 F.2d 505 (3d Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)] and its progeny, were absent when plaintiffs decided to begin this suit in 1982.

*Hill,* at 696. Here, however, there was no uncertainty as to the *application* of *Roberts* and *Biggans* to the particular facts of this case; the *Sharp* panel had decided the applicable limitations period for actions against accountants in Pennsylvania, thus creating clear precedent for plaintiffs to reasonably rely upon. This decision comports with circuit jurisprudence regarding retroactive application of the Supreme Court decision, *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), where the Third Circuit has focused on whether there was clear precedent during the relevant time periods as to the appropriate state limitations provision applicable to the particular claim brought under 42 U.S.C. § 1983. *See, e.g., Pratt v. Thornburgh,* 807 F.2d 355 (3d Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 125, 98 L.Ed.2d 83 (1987); *Fitzgerald v. Larson,* 769 F.2d 160 (3d Cir.1985). While some applications of *Biggans* and *Roberts* may have been unsettled because of variations in state securities' law and the myriad types of securities claims that can arise under section 10(b) and rule 10b–5, this case does not present one of those situations.

Defendant's attempts to show that plaintiffs could not have reasonably relied upon *Sharp* are unavailing. First, it asserts that a Pennsylvania Superior Court decision, which indicated, in dicta, that an action may lie against an attorney under the Pennsylvania Blue Sky law undercuts *Sharp. See Brennan v. Reed, Smith, Shaw & McClay,* 304 Pa.Super. 399, 450 A.2d 740 (1982); *see also Bull v. American Bank & Trust Co.,* 641 F.Supp. 62, 66–67 n. 5 (E.D.Pa.1986). As plaintiffs note, however, the statement in *Brennan* was dicta and did not include a reasoned interpretation of the relevant statute, which had not

---

**4.** In *Hill,* the court assumed that the second factor was neutral. Here, neither party has asserted otherwise nor do I see any reason to differ with this conclusion.

changed since *Sharp* or *Biggans.* Thus, *Brennan* is insufficient to put *Sharp* in question to the extent that an investor could not reasonably rely on its holding. Similarly, *Bull,* so far as it contradicts *Sharp,* has no relevance as it ignored clear binding precedent in this circuit. Moreover, *Bull* is distinguishable as it characterized the defendants as "related" to the sellers for purposes of the Pennsylvania Blue Sky law, an analysis that does not apply to Price–Waterhouse.

Second, defendant contends that plaintiffs could not rely upon *Biggans, Roberts,* and *Sharp* because their case by case approach to the limitations issue was undermined by the subsequent Supreme Court decisions in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), and *DelCostello v. Int'l Brd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).[5] As the dissenting judges in *Data Access* noted, however, none of these cases "even considered, much less clearly overruled, Third Circuit precedent dealing with securities fraud. Today's action of our court in overruling those cases and adopting a federal statute of limitations clearly overturns past circuit precedent on which plaintiffs may have relied." *Data Access,* 843 F.2d at 1553 (Seitz, J., dissenting);[6] *See also Penturelli v. Spector Cohen Gadon & Rosen,* 640 F.Supp. 868, 872 (E.D. Pa.1986) (concluding that *Wilson v. Garcia* did not affect the holdings of *Sharp* and *Biggans* ). Given a litigant's need to know the appropriate limitations with a reasonable degree of certainty, it is not reasonable to hold that plaintiffs should have analogized from Supreme Court decisions on the statute of limitations in unrelated areas to draw into question clear and unequivocal precedent setting the exact time to bring suit. In light of the binding precedent in this circuit and the fact that the

Supreme Court decisions did not directly deal with securities actions against accountants, it was reasonable for plaintiffs to rely on *Sharp* during the relevant time period.

It is also clear that the third *Chevron* factor favors prospective application of *Data Access* to this case. As I find, *infra,* plaintiffs claims, as a matter of law, accrued prior to July 3, 1985; therefore, retroactive application of *Data Access* wold bar plaintiffs section 10(b) and rule 10b–5 claims. It would be inequitable to conclude that plaintiffs "slept on their rights" and thus are deprived of their day in court when, during the relevant time period, they could reasonably rely on a two-year period to bring their section 10(b) and rule 10b–5 claims. This factor is directly contrary to *Hill* where the limitations period was identical whether *Data Access* or prior law applied. Thus, I will not apply *Data Access* retroactively here since the *Chevron* factors support prospective application.

### B. *Accrual of the Statute of Limitations*

While state law provides the statute of limitations for the section 10(b) and rule 10b–5 claims since *Data Access* does not apply retroactively, federal law determines when the limitations period on these actions and the section 11 claim begins to run.[7] This period runs from the date plaintiffs discovered or in the exercise of reasonable diligence should have discovered the basis for their claim against Price Waterhouse. *See e.g., Hobson v. Wilson,* 737 F.2d 1, 34 n. 103 (D.C.Cir.1984) (collecting cases), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Tobacco and Allied Stocks, Inc. v. Transamerica Corp.,* 143 F.Supp. 323, 329 (D.Del.1956), *aff'd,* 244 F.2d 902 (3d Cir.1957). Defend-

---

5. Defendant also points to *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), however, this decision was filed after plaintiffs brought this action.

6. In *Data Access,* Judges Seitz, Sloviter, and Mansmann dissented from the majority's decision not to rule on the retroactivity of *Data*

*Access.* The dissenters concluded that the decision should not be applied retroactively.

7. The common law claims start to run from the date plaintiffs knew or had reason to know by the exercise of reasonable diligence of the existence of their injury and that the injury was caused by another person's conduct. *See e.g., Urland, supra.*

ant argues that plaintiffs should have known of its alleged misconduct prior to July 3, 1984, or, at the latest, before July 3, 1985.

Whether plaintiffs should have known of their claims in the exercise of reasonable diligence requires consideration of several elements. First, plaintiffs must have sufficient information of possible wrongdoing to place them on "inquiry notice" or to excite "storm warnings" of culpable activity.[8] Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period. *See e.g. Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 127–28 (1st Cir. 1987); *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873 (9th Cir.1984); *Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir.1979); *Cook v. Avien, Inc.*, 573 F.2d 685 (5th Cir.1978). Whether plaintiffs should have discovered the defendant's culpable actions involves both an objective and subjective analysis of what should have been discovered by plaintiffs in the exercise of reasonable diligence. *See e.g., Maggio*, 824 F.2d at 128; *Tobacco and Allied Stocks*, 143 F.Supp. at 323. Finally, the exercise of reasonable diligence must lead to discovery of facts indicating defendant's wrongful conduct or, as one court has stated, discovery of "such information, considering both its content and source, as would prompt a reasonably prudent person to undertake a lawsuit to enforce his or her claim." *Creamer v. General Teamsters Local Union 326*, 579 F.Supp. 1284, 1291 (D.Del.1984) (Stapleton, J.); *See also Mosesian, supra; Robertson, supra.* With these principles in mind, I will now turn to the facts of the statute of limitations defense.

## II. Running of the Statute of Limitations Prior to July 3, 1984

■ Since plaintiffs' section 10(b) and rule 10b–5 claims are governed by a two-year period of repose, they are barred if plaintiffs, by the exercise of reasonable diligence, knew or should have known of the basis for their claims against Price Waterhouse prior to July 3, 1984. Similarly, the common law claim runs from the date plaintiffs in the exercise of reasonable diligence knew or should have known of their injury and that it was caused by Price Waterhouse. The facts relied upon by Price Waterhouse fail to lead to either conclusion as a matter of law; therefore, I will deny defendant's motion for summary judgment of these claims.

Prior to July, 1984, plaintiffs were aware that AIA had changed from primarily a casino charterer to a scheduled service air carrier and that the change had not been disclosed in connection with the public offering. The large losses and other financial problems incurred by AIA were purportedly due to this change and led to the filing of the original class actions alleging that defendants fraudulently failed to disclose AIA's business change. It was also public information that AIA had not paid certain taxes in the fourth quarter of 1983, had begun to lay-off employees, and had attempted an unsuccessful private rights offering in May, 1984. Defendant also points to the fact that the plaintiffs obtained counsel in the spring of 1984 and brought suit against the AIA defendants in May, 1984.

None of these facts leads to a finding, as a matter of law, that plaintiffs were on inquiry notice concerning misconduct by

8. Judge Leahy has explained the standard for inquiry notice as follows:

What on the one hand is tantamount to an actual discovery of fraud should not be confused with what on the other carries a duty to investigate. It is impossible to lay down any general rule as to the amount of evidence or number of or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. *Tobacco and Allied Stocks*, 143 F.Supp. at 331.

Price Waterhouse in connection with preparation of the financial reports. While a sharp increase in losses and other financial troubles may lead to storm warnings of fraud in general, they do not automatically suggest wrongdoing by the accountant particularly in light of the reasonable inference, supported by the facts of record, that the precipitous decline was caused by the change in business which had no connection with the audits by Price Waterhouse. As noted by one court, "(f)inancial problems [ ] do not necessarily suggest accounting fraud." *Mosesian*, 727 F.2d at 878. Similarly, the allegations in the class action complaints focused on the failure by the original defendants to disclose AIA's transformation to a scheduled air carrier and the costs and expenses associated with the business transformation. Because this inference from the known facts is reasonable and does not hint nor lead to an indication of misconduct by defendant or even in the preparation of the financial reports, there is a genuine question of material fact as to whether plaintiffs were on inquiry notice of defendant's alleged wrongdoing by July 3, 1984.

III. Running of the Statute of Limitations Before July 3, 1985

While plaintiffs claims did not accrue before July 3, 1984, I conclude as a matter of law that based on the available information, plaintiffs were on inquiry notice if not actual notice of their claims against Price Waterhouse prior to July 3, 1985, and, in the exercise of reasonable diligence, should have discovered the basis of their claims within the limitations period. Thus, their section 11 claim is barred.

In addition to the pre-July 1984 information, plaintiffs were also aware of the following facts or allegations which in their totality raised sufficient storm warnings of errors in connection with the audited financial reports to put plaintiffs on inquiry notice.

First, in July 1984, one year after the public offering, AIA filed for reorganization in bankruptcy after nearly completing its financial decline. At the time, its stock was trading at $1.00 per share, down from the $10.00 per share public offering price. For the six months ending May 31, 1984, AIA had a net loss of $14,977,888 and a working capital deficit of $19,600,000. In September, it was reported that AIA lost $30,000,000 in the past year. In addition, it was announced in July that the company had agreed to sell 40 percent of its outstanding stock to an investor for roughly 18½ cents per share at a time when the stock was trading at $1.25 per share.

Second, beginning in September, 1984, there were several reports of fraud by AIA management. Outside counsel for AIA withdrew from representing AIA after reporting to the bankruptcy trustee knowledge of fraud by AIA management. It was also disclosed to the trustee that the FBI found several of AIA's financial and accounting records in a city dump. In addition, it was publicly revealed that federal and state investigations of AIA had been initiated and the trustee was served with a state grand jury subpoena. In November, 1984, it was reported that investigators had linked Roy Goldberg, president of ITG and a significant shareholder of AIA, to organized crime. The investigation of Roy Goldberg led to a review of the records of AIA which disclosed that ITG was made AIA's exclusive booking agent for one year after Goldberg loaned $500,000 and supplied a $750,000 letter of credit to AIA.

In June, 1985, George Phelan, a former financial officer at AIA, and Marc Gilbert, an accountant with AIA, were deposed. They testified to several incidents of fraud by AIA in connection with its financial reports. The most noteworthy scheme involved the reporting of a $2,200,000 purchase in the fall of 1983 of airplane engines that had only been leased. They were put on AIA's books as assets and the money used to balance a reduction in receivables, including those of ITG. It was further disclosed that AIA's financial records for this period had disappeared and substantial ITG receivables were written down in 1984.

Finally, the class began to receive documents from AIA in December, 1984, and documents from Price Waterhouse in early

1985. Included in the Price Waterhouse documents was a June 22, 1983, "Management Letter" from Price Waterhouse to AIA that detailed deficiencies in AIA's accounting procedures. The letter noted the failure by AIA to improve its reporting procedures with regard to transactions with ITG and the need for documentation of agreements between AIA and ITG, confirmation on a periodic basis of the balance due from ITG, and a closer analysis of the transactions between AIA and ITG.

While I am not aware of the contents of the discovery materials as a whole, plaintiffs' answers to interrogatories and requests for admissions served in the spring of 1985 in *In re AIA Securities Litigation,* serve to illustrate plaintiffs' knowledge and suspicions of wrongdoing. In their response to contention interrogatories, plaintiffs stated that discovery disclosed "per adventure" that "AIA's accounting and auditing system was completely inadequate, rendering reported financial figures unreliable." Plaintiffs also sought admissions that Price Waterhouse would not render an unqualified opinion until there was a $3,000,000 increase in capital from a note purchase agreement. They also sought verification that AIA had difficulty locating financial reports and data for the 1983 audit by Price Waterhouse and that AIA had not implemented better documentation with respect to its transactions. In addition, plaintiffs requested the following admissions:

46(a). The Prospectus failed to disclose all of the material terms of the arrangements between ITG and AIA in that:

(i) ITG was given extended terms of payment and AIA agreed to carry for extended periods of time up to at least $1 million in receivables due from ITG;

(ii) In contrast to prior practices where AIA collected fees in advance and received contract cancellation fees as receivables, ITG thereafter became responsible for collection of AIA's fees; and

(iii) The contract cancellation fees theretofore collectible by ITG, rather than AIA, were in excess of $700,000, causing a decrease in AIA's receivables and unearned revenue of November 30, 1982.

Finally, plaintiffs sought admissions that expenses were improperly capitalized in the financial statements as preoperating costs when they should have been taken as expenses.

These facts clearly illustrate that plaintiffs were at least on inquiry notice, if not actual notice, of alleged wrongdoing in the preparation of financial reports before July, 1985. Plaintiffs were aware or on inquiry notice of the existence of fraudulent transactions in the 1983 audited financial reports,[9] destruction of financial records, criminal investigations, and improper capitalization and improper inclusion of penalties as receivables in the 1982 audited reports. They were also aware of the deficiencies in the internal accounting system of AIA and the insufficient control and supervision of the transactions between AIA and ITG. These factors coupled with the complete financial downfall of AIA and the apparent aberration of the November 30, 1982, audited reports and the March 31, 1983, stub period which depicted a turnaround in business, as a matter of law, were sufficient storm warnings to excite inquiry into possible wrongdoing in connection with the financial reports and the 1982 audits by Price Waterhouse. Plaintiffs assert that none of these facts expressly indicates any wrongdoing by Price Waterhouse. Their focus is too narrow. The facts surely suggest that the audits were insufficient because of the alleged errors and fraudulent transactions that were either not uncovered or hidden by Price Waterhouse. As already stated, the standard is not discovery of actual wrongdoing, but of storm warnings sufficient, taken into account the particular circumstances, to excite inquiry and reasonable diligence to discover the wrongdoing.

---

**9.** I find unavailing plaintiffs' suggestion that fraud in connection with the 1983 audit is irrelevant. If a reasonable investor knew of fraudulent transactions in one year, he should be on notice to search for fraudulent transactions in other years, particularly, where as here, the fraudulent transactions were designed to lower ITG receivables on AIA's books.

Moreover, it appears that plaintiffs were on actual notice of their claims before July, 1985, as revealed by an examination of the complaint against Price Waterhouse. Plaintiffs allege, inter alia, the following bases for their claims against Price Waterhouse: (1) the audits were insufficient for Price Waterhouse to express an unqualified opinion due to AIA's accounting deficiencies; (2) accounts receivables were fraudulently overstated because of the inclusion of penalty payments from ITG; (3) Price Waterhouse had not carefully verified ITG transactions which it knew were suspect because of the lack of internal controls at AIA and the material relationship between AIA and ITG; and (4) certain disbursements were improperly capitalized as pre-operating expenses. As recounted above, plaintiffs knew the basis of these allegations or suspected this wrongdoing well before July, 1985.

Plaintiffs attempt to salvage their section 11 claim by asserting that it arises primarily from the overstatement of accounts caused by the use of forged confirmations purportedly from ITG and Roy Goldberg. They contend that they could not know of the use of forged confirmations until June, 1986, when they deposed Roy Goldberg and Kenneth Groome, ITG's controller. This attempt is unavailing. First, plaintiffs allege many other bases for their claims against Price Waterhouse which were known prior to July, 1985. Second, plaintiffs were on notice well before June, 1985, that the reporting of transactions between AIA and ITG were suspect as well as other errors in the calculation of receivables, thus placing them on inquiry notice and imposing a duty of reasonable diligence. Even assuming that plaintiffs should not have known of the fraud by Price Waterhouse until they deposed Messrs. Goldberg and Groome,[10] plaintiffs offer no explanation why they were not deposed until June 26, 1986, when counsel

for the trustee deposed Goldberg on November 4, 1985.[11] Thus, even accepting plaintiffs' narrow view of when they discovered the accounting errors by Price Waterhouse, there has been no showing why in the exercise of reasonable diligence, plaintiffs could not have made this discovery earlier.

In conclusion, I find that plaintiffs were at least on inquiry notice of their claims prior to July 3, 1985, and, in the exercise of due diligence, should have discovered the basis for the claims within one year; therefore, the section 11 claim is barred. Defendant's motion for summary judgment on plaintiffs' other claims is denied as I cannot find, as a matter of law, that plaintiffs' claims accrued before July 3, 1984.

---

10. Stipulation of fact number 86 states that class counsel sent a draft of the complaint against Price Waterhouse to plaintiff Gruber on June 17, 1986, two weeks before the depositions of the ITG officers.

11. A sharing agreement was entered between the class and the trustee which provided for joint prosecution and sharing of any recovery. On May 7, 1985, the agreement was approved by the Bankruptcy Court while I approved it on December 13, 1985 after notice to the class and a hearing.