**K.B. EQUITIES, INC.**

v.

**PRICE WATERHOUSE.**

**Civ. A. No. 86–4295.**

United States District Court,
E.D. Pennsylvania.

May 3, 1991.

---

Allen D. Black and Donald L. Perelman, Philadelphia, Pa., for plaintiff.

John G. Harkins, Jr. and Patricia L. Freeland, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

DITTER, District Judge.

This case is one in a series of claims concerning AIA Industries, Inc. *See In re AIA Industries, Inc. Securities Litigation,* Master File No. 84–2276 (E.D.Pa.). Here, plaintiff claims defendant, an accounting firm, produced fraudulent audits and financial statements for AIA and that plaintiff relied on these reports when purchasing AIA securities. Plaintiff alleges violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, and common law. Defendant asserts plaintiff's action is barred by the statute of limitations and has moved for summary judgment under Fed.R.Civ.P. 56. Having considered the parties' briefs and oral argument, I will grant defendant's motion.

## I. BACKGROUND

Plaintiff, KB Equities, is a Nevada Corporation. Its owners are Bernard Katz (65 percent) and George Bell (35 percent). As Mr. Bell has previously explained, these men formed the venture to "invest in high risk companies."

Both men are highly educated and experienced investors. Mr. Bell has spent over 35 years in the securities and investment field. During the relevant period, he was co-chairman of Janney Montgomery Scott ("JMS"), a Philadelphia stock broker. Mr. Katz, a professional investor, was the sole owner of the corporation that preceded KB and had been the chairman of the board and controlling shareholder of another company.

In March of 1983, and on June 18 and July 9, 1984, plaintiff bought securities in AIA, an airline company that began by providing charters to Atlantic City casinos and later initiated scheduled service to other cities. Defendant was AIA's accountant and in that capacity prepared the firm's financial statements during this period.

Plaintiff claims it directly relied on these reports when making its investments in AIA. KB further alleges the reports were "tainted by errors, inaccuracies, and downright fraud." As a result, plaintiff seeks damages under the 1934 Securities Act, Rule 10b–5, and the common law. I conclude, however, that the statute of limitations is a bar.

## II. DISCUSSION

### A. *Statute of Limitations*

A two year statute of limitations governs both plaintiff's federal and common law claims. The parties have never disputed this period for the common law claims, but there has been some controversy over the federal claims. In both *Gruber v. Price Waterhouse,* 697 F.Supp. 859 (E.D.Pa.1988) *aff'd* 911 F.2d 960 (3d Cir.1990), and *ITG., Inc. v. Price Waterhouse,* 697 F.Supp. 867 (E.D.Pa.1988), two related cases, I held that the Third Circuit's decision in *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.1988), was not to be applied retroactively. For the reasons set forth in *Gruber* and *ITG,* the plaintiff's federal securities claims are restricted by the common law, two-year statute of limitations.

The relevant inquiry is also the same for all of the claims: since the clock started when plaintiff knew or should have known of the injury and its cause, the question is when KB was on notice that PW's financial statements were inadequate.

Once again, I addressed this subject fully in *Gruber* and *ITG.* In both opinions, I discussed constructive notice in the securities fraud context:

[A plaintiff] must have sufficient information of possible wrongdoing to place [him or her] on inquiry notice or to excite storm warnings of culpable activity.... Once on inquiry notice, [a plaintiff has] a duty to exercise reasonable diligence to uncover the basis for [any] claims and [is] held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period. *Gruber*, 697 F.Supp. at 864; *ITG*, 697 F.Supp. at 870 (internal citations omitted).

The duty of diligent analysis is both subjective and objective, and several factors guide it. Previous courts have considered particular circumstances like the existence of a fiduciary relationship, concealment of fraud, opportunity to detect fraud, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings. *See Tobacco and Allied Stocks, Inc. v. Transamerica Corp.*, 143 F.Supp. 323, 329 (D.Del.1956) *aff'd*, 244 F.2d 902 (3d Cir.1957); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987).

Plaintiff brought this suit on July 18, 1986. As a result, my job here is to analyze the record for evidence of storm warnings at AIA, storm warnings that would have made plaintiff aware that PW's reports had not been reliable. Having done so, I conclude a reasonable jury would necessarily find that plaintiff saw black clouds and lightning, heard howling winds and thunder, and felt the drive of hail and rain well before July 18, 1984. Plaintiff was surrounded by more than warnings—the storm had begun.

B. *The Falling Barometer Cannot Be Ignored*

■ Prospective investors try to predict a company's future, and they frequently rely on an independent accounting firm's report. Where the data is flawed or incomplete, the accountant may be liable in damages for the harm it has caused. A different result follows, of course, if the investor has better access to information and knows more than the accountant for then reliance would not be justified. It is easy to see why.

To permit an investor to sit idly by would permit the securities acts to be used as safe havens for speculation and a buffer against any investment loss. When faced with knowledge of a company's serious financial difficulty, an investor cannot be allowed to wait for market increases knowing that if growth does not take place the securities acts will provide insurance against loss. Instead, the exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and *mandates that early steps be taken to appraise those facts which come to the investor's attention*. *ITG* at 874 (emphasis in original) (quoting *Cook v. Avien*, 573 F.2d 685, 695 (1st Cir.1978)).

■ Given this standard, PW's forecast will not indemnify KB against its own bad judgment. Mr. Bell, an experienced investor and sophisticated business man, was the consummate insider. A member of AIA's board of directors and its auditing committee, Bell was intimately acquainted with the company's financial dealings and reports. Moreover, as co-chairman of JMS, AIA's investment banker,[1] Bell was privy to all the information that the JMS–AIA relationship generated, including previews of all AIA press releases.

From his unique vantage point, Bell saw AIA's deteriorating financial position, saw other directors leave the board, and saw management's tremendously suspect financial forecasting. Most importantly, though, in letters and comments to others, Bell cited this behavior and expressed his own discomfort with the AIA management's integrity and candor. Any one of these factors alone might be enough to create constructive notice. Together, they provide a firm basis for summary judgment.

---

1. In this role, JMS arranged a private placement of AIA convertible notes in March 1983, and in July 1983, was co-lead underwriter for AIA's initial public offering.

## C. *Tracking the Storm*

As early as August 1983, Bell witnessed the AIA management's questionable forecasting. In a confidential, internal JMS memorandum, Jeffrey Price, a JMS employee who worked with Bell on the AIA account, wrote to Bell and others about confusion in the projected earnings:

> Arthur [Toll] [2] thinks his earnings for the year will be $.35–$.40, while Blair's [3] internal memo says $.75. Things sure have changed rather radically in the last 40 days. Arthur doesn't recall telling Blair that it was $.75. Pretty interesting way of doing things (he told me $.75 also). The road show version was $.40–$.45. Exhibit 37.

Bell's own notes on his copy indicate his questions about Toll's management. Bell wrote: " 'Crisis Mgt'—Does Toll continue to play brinksmanship [sic] on an emotional high," and noted "Corporate Arrogance 'Walking on Water.' "

Bell again indicated concern about AIA's financial reporting in a notation on his copy of the September 1983 board of directors meeting minutes. Prior to this gathering, AIA had rapidly expanded its scheduled service into several new destinations. Bell wrote next to the section entitled Financial Status: "Size of Loss not discussed!!" At this meeting, the directors talked about director's insurance, and Bell noted that he was urged to contract for this protection "as soon as possible."

On October 27, 1983, an AIA press release predicted the company would show losses from $3 to $5 million in the fiscal year 1983.

Around this time, various people generated letters that evinced general dissatisfaction not only with management's business conduct, but also its integrity and truthfulness. On October 7, 1983, Allen Davis, president of an AIA creditor, wrote to Toll on behalf of himself and other unnamed investors. He felt the airline was expanding too quickly given its capital base and suggested AIA "slow down, pay attention

to the airline, expand its capital base, improve its operations and decide on other ventures next year." Exhibit 45.

The same week, Douglas Jackson, an investor and member of the AIA board of directors, wrote a letter which echoed Mr. Davis' concerns about rapid expansion. Jackson also expressed concerns about management's disregard of the board. He cited:

> the fact that we received July financial statements at the Board Meeting on September 28; that the company is not operating against a realistic current projection for either this fiscal year or seems to be moving toward one for next; that between two consecutive board meetings, decisions have been made to dramatically expand the number of hubs served by the company and to add 727's to the fleet; that significant transactions will not be presented formally, in written form, to the board until the company has reached a point of no return. Specifically, I think that a summary of the United/Western proposed merger should have been presented at the 9/28 meeting. Exhibit 45.

Because Price received a copy of the Davis letter, and Bell himself received a copy of the Jackson letter, Bell was aware of both documents and the sentiments they conveyed. Moreover, on October 18th, Bell wrote his own letter to Toll and explicitly mentioned the others.

Bell sent his letter personally and confidentially to Mr. Toll's home so only Toll would see it. In fact, the letter mentions this point twice. In substance, the letter reiterates Jackson's and Davis' expansion concerns, and like the Jackson letter, it mentions the credibility problem. Bell wrote, "at the present time with the announcement of AIA's third quarter earnings and fourth quarter projections the credibility level of AIA's management is embarrassingly low. We must refill the credibility gap and regain the confidence of the public shareholders in the management

---

**2.** Arthur Toll was the Chairman of the Board and Chief Executive Officer of AIA.

**3.** Blair Thompson was a JMS employee, assigned to work with Bell on the AIA account.

and concomitantly AIA's future." Exhibit 49. Bell closed the letter, "Hope Director's Liability Insurance is in place." *Id.*

After more loss reports in January, 1984, Price wrote a draft letter to Toll. This strongly worded document is yet another indication that the company's financial forecasts were skewed.

> I see very little of the operational side of AIA, but quite obviously something has to be fundamentally wrong when the costs side of the business is consistently divergent from Bruce's and your predictions. This problem has been repeated time and again—last summer, during the transaction, late November through January 4, and even in the rest of January. (Break-even load factors are wrong, conversion expenses are wrong, and profit projections are always too high.) Exhibit 57.

While Price's letter does not reflect JMS' official position, the fact that Price and Bell worked together on the AIA matter, and Price's discussion of the same points (and in some cases with Bell's exact words)[4] indicates that Bell at least should have known that Price felt this way. Moreover, at his deposition, in discussing his decision to include another paragraph concerning Toll's credibility in the letter, Price named Bell and Katz as people who doubted Toll's credibility.

A letter from Bell to Bruce Edmondson, then senior vice president of AIA, confirms Bell's knowledge of and concern with the credibility problem. Bell explained:

> For some time I have been deeply concerned with the substantial short-fall between budgets (projections) and actual earnings. If the short-falls occurred but once, and/or were close to the budgeted figures, I would not be so alarmed. Needless to say, the earnings short-falls have been substantial and continuing and viewed with intense suspicion by the in-

vestment community notwithstanding various explanations.

\* \* \* \* \* \*

> I need not retrace for you the revenues and earnings projections which have been given to the Directors and/or JMS other than to say that *every major projection which I have seen for a period commencing over one year ago ... have been/appear to be extremely unreliable.*

\* \* \* \* \* \*

> ... I feel a responsibility for the disappointing results ... and for the credibility which has been impaired by the company's inability to come close to its budget or projections at "the bottom line." I would, therefore, urge that the budgeting process be given in-depth scrutiny and a more conservative approach be adopted. Perhaps those employees who supply you with estimates, etc., should be considered suspect. Exhibit 58 (emphasis added).

This letter alone is evidence that Bell was well aware of the storm brewing at AIA. In conjunction, with the circumstances that precede it, the letter creates a compelling case against KB. These events were only the beginning, though.

### D. *A Darkening Sky*

Starting in February 1984, Bell received copies of letters from two board members who would later resign. On the 17th, Howard Boros wrote a four-page letter to Toll. In this document, Boros noted that AIA's financial reports to the board were "not current" and the financial projections were "wholly unreliable," and not even in the ballpark. Boros added, "we are also in the dark regarding the company's current cash flow position, and we do not know anything regarding the economic prospects of the company under present circumstances." Exhibit 59. The letter continues, noting many other areas where Boros

---

**4.** Price, like Bell, suggests increasing the management staff. He discusses credibility, and he also describes the company's management strategy as "brinksmanship" [sic]. Bell hand wrote the same misspelling/mispronunciation on his copy of the JMS August 1983 memorandum concerning AIA.

felt management was withholding information from the board.

Three days later, Allen Marmon, another board member, wrote a similar letter to Toll. In discussing the company's management plan, Marmon claimed "the information thus far received by the Board has been so vague and/or so incomplete that it merits no consideration from the Board." Marmon continued:

> In particular, the Board was misled about the final profit and loss figures for the year ending November 30, 1983. Various escalating estimates of loss were announced by management which led me to believe prior to the Board meeting of January 20, 1984 that the company's losses would not exceed $6.25 million. However, to my chagrin, on January 19, 1984 I received financial reports from the company informing me that it had experienced a $11 million loss. The failure of management to advise the Board of such a serious, negative turn of events was inexcusable. Exhibit 60.

On February 27, 1984, both Marmon and Boros resigned from the board of directors. In addition, Mr. Boros' law firm resigned as general counsel for AIA. Bell knew all of these things.

Within the next three weeks, Price prepared two memoranda concerning AIA for the JMS files. The first used the terms "questionable ethics" and "deceptiveness" to describe management's conduct. Price wrote, "the picture [of the company] that was painted was completely inaccurate even given the most optimistic view one could have given to the facts as they prevailed at the time." Exhibit 64. The second memorandum noted that Katz had said Toll was "running the company as if it was a sporting goods store instead as a [sic] truly publicly held corporation." Price also reported that "Katz's thoughts that Toll figured he could get away with it since he is using the public's money are fairly outrageous but perhaps accurate." Exhibit 66.

Finally, the second memorandum contains a section headlined "Honesty in Disclosure." This portion discussed how management had not been candid concerning the flight schedule and AIA's relationship with casinos—a major component in their Atlantic City business. *Id.* Price concluded the document: "Arthur [Toll] simply told us what we wanted to hear, but ultimately acted in different ways." *Id.*

Even after all of these events, there were more indications that AIA was in serious financial trouble and management was not being forthright. In addition, there were more instances when Bell himself noted these exact problems showing his knowledge of the gathering thunderheads.

In May 1984 as its losses mounted, AIA prepared to issue warrants and stock to raise money. JMS refused to take part in the deal. As Price explained:

> We never, ever considered underwriting it. There was at one time a brief discussion back when it was originally contemplated by the company to do such an offering, and it was quickly rejected out of hand by officers of Janney Montgomery Scott. Exhibit 33.

Later in the same month, lightning struck. On May 10, Oscar Gruber filed a class action against AIA, its officers, directors (including Bell) and others. The Gruber suit charged violations of section 11, 12(2), and 15 of the Securities and Exchange Act of 1933. On May 18, Raymond Shatz, an AIA shareholder, brought suit against it. Here again, Bell was named as a defendant. Bell not only knew about both cases but retained his own counsel. *See* Exhibit 73. In this same month, Bell also wrote a memorandum to the files which explained that he had thought about resigning from the board, but his associates persuaded him not to do so.

The last, and most persuasive, document showing Bell's knowledge of problems at AIA is his memorandum to the files dated July 18, 1984 (exactly two years before this suit was initiated). The memorandum, which was written nine days after plaintiff's last purchase of AIA stock, begins by describing a phone conversation in which Toll told Bell that AIA was on the verge of bankruptcy. Bell notes: "I called Katz

that day and appraised him of what I had been told *plus my continuing lack of confidence in Toll's trustworthiness, candor and integrity.* Katz said he would be interested in talking with Toll so I 'stepped aside.'" Exhibit 76 (emphasis added).

Bell then describes how Katz flew to Philadelphia, met with the AIA managers, and then arranged a meeting with Bell. Bell went on:

> In essence, he [Katz] felt it was worthwhile to take a "shot" at resuscitating AIA. It was obvious to him and to everybody close to the Company that the Company was on the brink of Chapter 11 and if no cash was in AIA's hands by Monday, July 9th the Company was prepared to file for bankruptcy. Over the weekend, Katz worked out a plan which would involve K.B. Equities injecting money into AIA and further working with creditors, commercial bankers and the company's present management to determine what might be salvaged. *Id.*

The preceding are not the words and acts of a man relying on Price Waterhouse's financial statements, but rather those of a well informed, sophisticated investor deciding on the basis of full knowledge that a risky investment was worthwhile. This document shows beyond any doubt that Bell knew about AIA's financial troubles, did not trust Toll, and communicated this information to Katz.

Moreover, Bell's wariness about Toll was based on Toll's inaccurate and untrustworthy financial reporting. Since Bell knew that Toll had not been forthright with the AIA board, investors, or JMS, Bell should have expected Toll had been lying to PW too. On the basis of this memorandum alone there is no doubt that KB was fully aware some time before July 18, 1984, of the deluge to come. With all he knew, if Bell read PW's reports at all critically, he would have been forced to the realization that Toll was not only trying to deceive him but was probably trying to deceive PW as well.

All these facts lead to the inescapable conclusion that KB's principals had actual knowledge that AIA was on the verge of collapse more than two years before they brought suit. When they finally filed a claim, it was too late to try to blame PW for their losses.

If all of this was not enough to exonerate PW, there is also the admission of KB's attorney, Donald Perelman, at oral argument. In response to my question about the value of a seven month old financial statement, especially in light of all of the activity and information that arose after PW released it, Mr. Perelman conceded the statement was old. He also claimed plaintiff was not looking at the statement when it made its decision to buy the AIA stock. Of course, this position is entirely at odds with the gravamen of plaintiff's complaint.

### E. "It Is Not Raining Rain To Me, It's Raining Violets" is Better Poetry than Investment Logic

Even ignoring this admission from plaintiff's attorney, the arguments plaintiff musters to counter the flood of facts are unavailing. Plaintiff claims it could trust PW's statements because an accounting firm has a higher duty. Plaintiff claims it relied on the financial statements as being truthful and bought shares based on the erroneous reporting. This argument, though, does not square with the facts.

Bell and Katz knew AIA was on the verge of bankruptcy. Bell reports that he said so to Katz in a phone call in early July, 1984. To suggest that these sophisticated, experienced men threw all of their intimate knowledge of AIA away to rely on a seven-month old financial statement is ludicrous. The question here is whether KB's principals knew or should have known more than two years before filing this suit that whatever reliance they were putting on PW statements was misplaced. PW's higher duty and honor have little to do with the inquiry. KB had so much knowledge and expressed so much suspicion about AIA's financial and management practices, it is hard to imagine how any report or collection of information could counteract KB's understanding of the situation, no matter what the source. In fact, Bell's first hand knowledge of Toll's previous behavior and

**1012**

AIA's true financial position should have made every report suspect.

What I wrote in *ITG*, is relevant here.

It is important to remember plaintiffs were not normal investors; rather, they wore several hats with respect to AIA.... Moreover, they persisted in providing additional financial and business help to AIA well after it faced imminent death. I find it incredulous for plaintiffs given their interests, to assert blind reliance on the financial statements audited by Price Waterhouse when the most basic examination of the prospectus and cross check with [their] own records would have disclosed substantial inconsistencies. *ITG* at 873-4.

KB had no easy opportunity to cross check records as did the *ITG* plaintiffs, but it was particularly wary of AIA's managers and everything they said. Under these circumstances, KB should have questioned PW's audit just as they did every other financial projection, estimate, and report that concerned AIA. After all, the ultimate source of all financial materials was the same: it was AIA's internal record keeping, and neither Bell nor Katz trusted that. As a result, KB cannot assert blind reliance on PW's audits.

### III. CONCLUSION

For all these reasons, I conclude KB knew or should have known about the problems with PW's financial reporting more than two years before filing this suit and that no reasonable juror would decide to the contrary. Therefore, the statute of limitations bars this action.