306 F.3d 1314
 In re NAHC, INC. SECURITIES LITIGATION
Jack BRADY, Roger W. Svec, Jacob A. Salzmann, David Fisher, Chris Pietrafitta, Frank J. Siefert, Franz Schleicher, Barry Weisberg and Bruce Bardone Appellants.
 No. 01-4132.
 United States Court of Appeals, Third Circuit.
 Submitted under Third Circuit LAR 34.1(a) July 18, 2002.
 Filed: October 3, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John F. Innelli, Michael J. Molder, Innelli and Molder, Philadelphia, PA, Mark Levine, Stull, Stull & Brody, Peter S. Linden, Kirby, McInerney & Squire, LLP, New York, NY, for Appellants, Jack Brady, Roger W. Svec, Jacob A. Salzmann, David Fisher, Chris Pietrafitta, Frank J. Siefert, Franz Schleicher, Barry Weisberg and Bruce Bardone.
 Timothy C. Russell, Spector, Gadson & Rosen, P.C., Philadelphia, PA, David W.R. Wawro, Edward J. Henderson, Torys LLP, New York, NY, Mark C. Hansen, Kellogg, Huber, Hansen, Todd, & Evans, P.L.L.C., Washington, D.C., for Appellees, NAHC, Inc., John Foster, Timothy Foster, James W. McLane and Robert E. Healy, Jr.
 John W. Frazier, IV, John E. Caruso, Jill Baisinger, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, for Appellee, PriceWaterhouseCoopers.
 Martin Flumenbaum, Maria T. Vullo, Robyn M. Sorid, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, Howard M. Klein, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Appellee, Wasserstein Perella & Co., Inc.
 Before: McKEE, FUENTES and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 A number of shareholders[1] of NovaCare, Inc.'s (now known as NAHC, Inc.) ("NovaCare" or "Company") appeal from the dismissal of their consolidated amended complaint ("the Complaint") by the district court pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4 et seq. They also appeal from the court's granting of NovaCare's motion for judicial notice. Undergirding this appeal are §§ 10(b), 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.14a-9.
 
 
 2
 The district court applied an "inquiry notice" standard to determine when the limitations period begins to run in a securities fraud action. Appellants contend that the court should have applied an actual notice standard. "We have adopted an inquiry notice standard in the context of a case brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. See Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 251 (3d Cir.2001). We have not, however, decided the precise standard in the context of a securities fraud claim." We do so now and conclude that the district court did not err in applying this standard and dismissing, as time-barred, the majority of Appellants' contentions. We also decide that the large number of other issues raised by Appellants were properly decided by the district court and affirm its judgment of dismissal in all respects.
 
 I.
 
 3
 NovaCare, a national provider of physical rehabilitation and employee benefits management services, operated in three industry segments: (1) long-term care services, consisting of physical rehabilitation services; (2) outpatient services, comprising physical rehabilitation and occupational health services ("PROH") as well as orthotic and prosthetic services ("O & P"); and (3) employee benefits management services, through a majority-owned subsidiary, NovaCare Employee Services, Inc. ("NCES"). The Company experienced substantial growth from its inception in 1985; by the end of the fiscal year ending June 30, 1998, NovaCare claimed the nation's highest market share in the long-term care and orthotic and prosthetic rehabilitation markets. It was also the nation's second largest provider of outpatient physical rehabilitation and occupational health services, and, through NCES, was the second largest employee services provider.
 
 
 4
 Traditionally, long-term care services had been NovaCare's core business, and in fiscal 1998, it still accounted for approximately 40% of the Company's net revenues and 60% of its operating income. By the beginning of the relevant period in May of 1998, NovaCare common stock, listed on the New York Stock Exchange, traded generally in the range of $12 to $14 per share.
 
 
 5
 The future of the long-term care services business was about to change, however. For many years, nursing homes had been reimbursed for therapy services on a cost-basis, subject to guidelines designed to ensure that costs were reasonable. On May 12, 1998, the Health Care Financing Administration ("HCFA") issued preliminary regulations implementing the Balanced Budget Act of 1997 (the "BBA"). The regulations drastically altered the method of reimbursement by Medicare and Medicaid to long-term care providers of contract therapy services, switching from reimbursement on a cost basis to reimbursement based on a per diem and specific fee schedule structure. Approximately one week following the issuance of the HCFA guidelines, 10 NovaCare executives collectively sold nearly 600,000 shares of NovaCare stock. One of the executives was Defendant T. Foster, who sold roughly $4.1 million in shares on May 20, 1998.
 
 
 6
 Following implementation of the HCFA guidelines, NovaCare reported increasingly diminished revenues for its long-term care services segment in each quarter of the 1999 fiscal year. The Balanced Budget Act's impact on NovaCare's long-term care business eventually led to a significant decline in the Company's stock price listing. It then issued a warning in its 1998 Annual Report:
 
 
 7
 Due to the extensive nature of the reimbursement changes specified by the BBA, the uncertainty regarding the application of fee schedules and an annual cap on Medicare Part B services, the effect these changes may have on the demand for services and management's inability to predict what portion of the PPS and fee schedule rates that NovaCare will be able to receive based on negotiated term of service contracts with its customers, the Company is unable to determine the impact that the BBA will have on its financial position on results of operations.
 
 
 8
 App. at 331.
 
 
 9
 On September 22, 1998, after the Company announced expectations of significant declines in first quarter earnings as a result of unanticipated delays in the transition to the new reimbursement system, the Company's stock dropped by approximately $3 per share from $7 to $4. By April 1, 1999, NovaCare was trading at $1.188. Notwithstanding the new statute's materially adverse effect on the Company's financial condition, the Company did not adjust the value of goodwill as an asset of the long-term care division in the financial statements on the Securities and Exchange Commission ("SEC") Form 10-K for the 1998 fiscal year (the "1998 Form 10-K") or on the SEC Forms 10-Q for the first and second quarter of the 1999 fiscal year (the "1st Quarter 10-Q" and "2nd Quarter 10-Q," respectively).
 
 
 10
 From April 1999 onwards, NovaCare began to implement a series of restructuring plans to retire its bank debt and improve its capital structure, and this ultimately resulted in the sale of all of the Company's operating lines of business. On April 5, 1999, the Company announced that it had entered into an agreement to sell its Orthotic and Prosthetic business to Hanger Orthopedic Group, Inc. for $455 million. On May 28, 1999, NovaCare announced that it had agreed to divest its long-term care services business to Chance Murphy, Inc. for only nominal consideration.
 
 
 11
 On May 30, 1999, T. Foster, McLane and Healy renegotiated their employment contracts, providing for transaction and retention bonuses tied to the sale of NCES, the sale of PROH, and the earlier of either the liquidation of the Company or June 30, 2000.
 
 
 12
 On August 16, 1999, the board of directors of NovaCare announced that it had approved a proposal to sell the PROH division and the Company's shares in NCES to satisfy the Company's outstanding debentures, and to reinvest or to liquidate and distribute to stockholders any remaining proceeds (the "Restructuring Plan"). On August 13, 1999, NovaCare filed with the SEC, and mailed to its shareholders, proxy materials announcing a special meeting for the shareholders to vote on the Restructuring Plan (the "Proxy Statement"). The Proxy Statement estimated that the proceeds available for distribution in the event of a liquidation would range from $1.76 to $3.94 per common share. On September 8, 1999, the Company announced that it had entered into an agreement, subject to shareholder approval of the Restructuring Plan, to sell its shares in NCES to an investment group at $2.50 per share, amounting to approximately $48.5 million. On September 10, the Company filed and sent additional proxy materials, which included an opinion letter by Wasserstein assessing the fairness of the NCES transaction.
 
 
 13
 On September 20, 1999, the Company filed an SEC Form 10-K for the 1999 fiscal year. The Company did not reassess its goodwill in light of the Restructuring Plan or adjust the value of goodwill as an asset in the 1999 Form 10-K's financial statements.
 
 
 14
 The shareholders of NovaCare approved the Restructuring Plan on September 21, 1999. On October 4, 1999, the Company announced that it had agreed to sell the PROH division to Select Medical Corporation ("Select Medical") for approximately $200 million in cash and debt assumption.
 
 
 15
 On November 22, 1999, the Company filed its Form 10-Q with the SEC, releasing its financial results for the first quarter of the 2000 fiscal year. This Form 10-Q disclosed the following developments:
 
 
 16
 (a) Hanger had claimed there was a $29 million shortfall in NovaCare's calculation of the O & P division's working capital, for which NovaCare was responsible pursuant to the sale agreement's working capital guarantee;
 
 
 17
 (b) NovaCare was writing off assets that it had retained from the long-term care services business, and that between the write-off and the working capital guarantee that it provided to Chance Murphy, the Company would incur roughly $24.4 million in losses related to the long-term care services business;
 
 
 18
 (c) NovaCare had placed more than $13 million in escrow in support of the guarantee to the NCES investors for four years of gross profits from a services agreement with the PROH business, a guarantee on which NovaCare was required to perform when Select Medical declined to enter into the agreement; and
 
 
 19
 (d) the Company had to hold in escrow $36.8 million of the sale proceeds from the PROH sale, and pay $26 million in transaction costs and other liabilities, so NovaCare would receive only $99 million in cash proceeds from Select Medical.
 
 
 20
 App. at 6. The Form 10-Q also revealed that as a result of the foregoing developments, the estimated liquidation value now ranged from $0.10 to $1.00 per share. On November 26, 1999, the first day of trading following the release of Form 10-Q, NovaCare's stock price dropped 75% to $0.125 per share. On November 14, 2000, NovaCare disclosed that there would be no liquidated dividend, and that the Company held insufficient funds to satisfy its outstanding debt.
 
 
 21
 Because of the broadband attack launched by the Appellants before us, it is necessary to set forth, in considerable detail, the comprehensive nature of the district court proceedings, and the seven separate contentions of reversible error asserted in this appeal.
 
 II.
 
 22
 On August 9, 2000, Jack Brady filed a complaint against NovaCare, a certain number of its officers and directors, and Wasserstein Perella & Co. The complaint asserted that defendants had misrepresented NovaCare's divestiture of its four operating businesses during 1999. It alleged claims under §§ 10(b), 14(a) and 20(a) of the Exchange Act and the rules thereunder on behalf of stockholders who purchased NovaCare stock from May 20, 1998, through November 22, 1999, or who were eligible to vote on a restructuring plan in September 1999. Brady published notice of the action in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(3).
 
 
 23
 On September 19, 2000, Chris Pietrafitta filed a complaint against the same defendants and also PriceWaterhouseCoopers LLP ("PwC"), alleging claims arising from the impact of the BBA on NovaCare's long-term care services business. The district court consolidated all pending actions, appointed lead plaintiffs and approved the selection of lead plaintiff's counsel.
 
 
 24
 On February 20, 2001, Appellants filed a consolidated and amended Complaint, incorporating the allegations of six previously filed complaints. On March 12, 2001, the district court granted plaintiffs leave to file a further amendment to correct certain misstated allegations in the consolidated Complaint.
 
 
 25
 Count I of the Complaint asserted Rule 10b-5 claims against the NovaCare Defendants. The plaintiffs alleged that the NovaCare Defendants engaged in a course of conduct from May 20, 1998, to November 22, 1999, in which they knowingly or recklessly issued materially false and misleading financial statements and failed to disclose significant terms of various asset sales in order to artificially inflate and maintain the price of NovaCare common stock.
 
 
 26
 The district court categorized the claims contained in Count I into six groups: (A) failure to adjust the goodwill of the long-term care services division in light of the BBA's impact; (B) failure to disclose that proceeds from the sale of the O & P division would be reduced because of overstated working capital; (C) failure to disclose that proceeds from the sale of the long-term care division would be reduced because of (i) overstated working capital and (ii) uncollectible accounts receivable; (D) failure to disclose that proceeds from the sale of the NCES division would be reduced because (i) the purchaser of PROH would not enter into an employment services contract with NCES, nor assume the Company's guarantee of the contract and (ii) NovaCare had placed funds in escrow to support the guarantee of the employment services contract; (E) failure to disclose that proceeds from the sale of the PROH division would be materially reduced because (i) the Company would lose the funds escrowed in support of the financial representations in the sales agreement due to the overstatement of the PROH working capital and accounts receivable and (ii) the Company would place $36 million in escrow in support of the financial representations and would incur $26 million in transactions costs and liabilities; and (F) failure to adjust the Company's goodwill despite the planned sale of all operating assets under the Restructuring Plan.
 
 
 27
 Count II of the Complaint asserted Rule 10b-5 claims against PwC, averring that PwC issued materially false and misleading audit reports for NovaCare's 1998 and 1999 Forms 10-K.
 
 
 28
 Count III of the Complaint asserted Rule 10b-5 claims against Wasserstein for issuing a materially false and misleading fairness opinion regarding the NCES transaction in the proxy materials.
 
 
 29
 Count IV of the Complaint asserted § 20(a) claims against the Individual Defendants, as control persons of the Company during the time of the alleged underlying violations of Rule 10b-5 and Rule 14a-9.
 
 
 30
 Count V of the Complaint asserted Rule 14a-9 claims against all of the defendants except PwC for issuing proxy materials with materially false or misleading statements regarding Claims (B) through (E) of Count I of the Complaint as listed above.
 
 
 31
 On April 20, 2001, the NovaCare defendants filed a motion to dismiss the amended Complaint and a motion for judicial notice of certain press releases and SEC filings referred to in the Complaint, other SEC documents filed during the relevant period, and NovaCare's published stock price throughout the alleged class periods.
 
 
 32
 On October 17, 2001, the district court issued a Memorandum and Order dismissing the consolidated amended Complaint under Rule 12(b)(6). In re NAHC Sec. Litig., Master File No. 00-4020 (E.D.Pa. Oct. 17, 2001) (hereinafter "D. Ct. Op."). The district court concluded that: (1) Appellants' claim arising from the impact of the BBA on NovaCare's long-term services business was time-barred under the relevant statute of limitations; (2) most of Appellants' other claims under § 10(b) of the Exchange Act failed to plead any misrepresentations; and (3) that Appellants' remaining § 10(b) claims were either based on alleged misrepresentations that were immaterial as a matter of law, or were not alleged to have been made with the requisite scienter. Furthermore, the district court held that Appellants' claims under § 14(a) of the Exchange Act failed to plead material misrepresentations or transactional causation and that Appellants' claims under § 20(a) of the Exchange Act were not viable in the absence of sufficiently pleaded claims under § 10(b) or § 14(a). The district court therefore entered an Order which dismissed the Complaint. Furthermore, the court denied Appellants the opportunity to further amend their Complaint, determining that any further efforts to amend would be futile. This appeal followed.
 
 III.
 
 33
 The district court had jurisdiction of the underlying action pursuant to 15 U.S.C. § 78aa. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 34
 We exercise de novo review of the district court's dismissal under Rule 12(b)(6), Maio v. Aetna, Inc., 221 F.3d 472, 481 (3d Cir.2000), and must accept as true all material allegations in the complaint, but we need not accept as true "unsupported conclusions and unwarranted inferences." Id. at 485 n. 12 (quoting City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n. 13 (3d Cir.1998)).
 
 
 35
 Furthermore, a court's decision whether to take judicial notice of certain facts is reviewed for abuse of discretion. Lozano v. Ashcroft, 258 F.3d 1160, 1164 (10th Cir.2001) (citing United States v. Wolny, 133 F.3d 758, 764-765 (10th Cir. 1998)).
 
 
 36
 Finally, we review the district court's denial of leave to amend the complaint for abuse of discretion. Singletary v. Pa. Dep't of Corrs., 266 F.3d 186, 193 (3d Cir.2001) (citing Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 457 (3d Cir.1996)).
 
 IV.
 
 37
 This appeal requires us to determine whether the district court properly dismissed Appellants' consolidated Complaint alleging various violations of the Securities and Exchange Act of 1934.[2] The district court initially determined that Appellants' "overstatement of goodwill" claim, located in Count I of the Complaint, was time-barred because Appellants were on inquiry notice for more than one year prior to the filing of their claim.
 
 A.
 
 38
 Before the district court, Appellants asserted that the NovaCare Appellees knowingly overstated the value of their long-term care services business by failing to write down goodwill in the financial statements presented in NovaCare's Annual and Quarterly Reports filed in fiscal 1998 and 1999. Appellants further alleged that this overstatement was a violation of generally accepted accounting principles. The district court determined that this claim was time-barred because Appellants were on inquiry notice of the claim for more than a year before actually filing it.
 
 
 39
 In Lampf v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Court determined that claims arising under § 10(b) of the Exchange Act are governed by the limitations rule set forth in § 9(e) of the Exchange Act: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). Allegations regarding the impact of the BBA on the goodwill of NovaCare's long-term care services division were first asserted by Appellants in their consolidated Complaint dated September 19, 2000.[3] Thus, to the extent that Appellants were on notice of the alleged overvaluation of goodwill prior to September 19, 1999, this claim of fraudulent misrepresentation is time-barred.
 
 1.
 
 40
 Appellants argue that the district court improperly applied an "inquiry notice" standard to determine when the limitations period begins to run in a securities fraud action, and instead should have applied an actual notice standard. They primarily rely on the language of Berry v. Valence Tech., Inc., 175 F.3d 699, 703 (9th Cir.1999), in which the court stated:
 
 
 41
 Plaintiffs contend that Lampf established an actual discovery standard for triggering the statute of limitations. Lampf does appear unequivocal on this point: "The 1-year period, by its terms, begins after discovery of the facts constituting the violation." 501 U.S. at 363, 111 S.Ct. 2773 ... Moreover, in applying section 9(e)'s limitations period to actions under section 10(b), Lampf explicitly chose a provision requiring actual discovery over other provisions allowing inquiry notice. In contrast to section 9(e), section 13 of the Securities and Exchange Act of 1933 ... stipulates that actions under that Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Supreme Court in Lampf acknowledged the difference, and was clear about its choice: "[T]he various 1-and-3-year periods contained in the 1934 and 1933 Acts differ slightly in terminology. To the extent that these distinctions in the future might prove significant, we select as the governing standard for an action under § 10(b) the language of § 9(e) of the 1934 Act." 501 U.S. at 364 n. 9, 111 S.Ct. 2773....
 
 
 42
 Berry, 175 F.3d at 703 (emphasis omitted).
 
 
 43
 Although, the above passage indicates that court's preference for an actual notice standard when confronted with a securities fraud situation, the Berry court did recognize that "[c]ourts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in question." Id. at 703 n. 4.
 
 2.
 
 44
 This is an open question in this court. We have yet to determine when the limitations period begins to run in a securities fraud action, although other courts of appeals, and district courts within this judicial circuit, have generally applied an inquiry notice standard, coupled with some form of reasonable diligence requirement in determining whether a plaintiff's securities claims are timely filed. Recently, we adopted an inquiry notice test for securities fraud claims in a RICO context. See Mathews, 260 F.3d at 251. We are not inclined to follow the analysis of the Court of Appeals for the Ninth Circuit, and accept the approach followed by the other Courts of Appeals and the district courts in this judicial circuit.[4]
 
 
 45
 To the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations.
 
 
 46
 Under the "inquiry notice" standard, the one-year period begins to run when the plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the defendant. Gruber v. Price Waterhouse, 697 F.Supp. 859, 863 (E.D.Pa. 1988) (citing Hobson v. Wilson, 737 F.2d 1, 34 n. 103 (D.C.Cir.1984)). Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had "sufficient information of possible wrongdoing to place them on `inquiry notice' or to excite `storm warnings' of culpable activity." Id. at 864. The test for "storm warnings" is an objective one, based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."[5] Mathews, 260 F.3d at 252. Plaintiffs need not know all of the details or "narrow aspects" of the alleged fraud to trigger the limitations period; instead, the period begins to run from "the time at which plaintiff should have discovered the general fraudulent scheme." In re Prudential Ins. Co. Sales Practices Litig., 975 F.Supp. 584, 599 (D.M.J.1997) (quoting McCoy v. Goldberg, 748 F.Supp. 146, 158 (S.D.N.Y.1990)).
 
 
 47
 "Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims, and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." Gruber, 697 F.Supp. at 864 (citing Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127-128 (1st Cir.1987); Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873 (9th Cir.1984); Robertson v. Seidman & Seidman, 609 F.2d 583 (2d Cir.1979); Cook v. Avien, Inc., 573 F.2d 685 (1st Cir.1978)).
 
 
 48
 The district court correctly applied the inquiry notice test in determining that Appellants' claim that NovaCare had overstated the value of its long-term care services business was time-barred. The court reasoned that Appellants were on inquiry notice of that claim no later than June 16, 1999, when NovaCare filed a Form 8-K announcing the completion of the sale of the long-term care services business for nominal consideration. This announcement was the culmination of a series of disclosures that put Appellants on notice that NovaCare's long-term care services business was in trouble. These disclosures included a press release in September 1998, and Quarterly Reports in November 1998 and February 1999, indicating a material decline in the revenues and earnings of that business. Then, beginning in early May 1999, NovaCare issued a series of specific disclosures which revealed that the long-term care services business had no valuable goodwill:
 
 
 49
 1) On May 11, 1999, NovaCare issued a press release stating that it was writing off the goodwill of its long-term care services business.
 
 
 50
 2) On May 17, 1999, NovaCare filed a Form 10-Q explaining that it was writing off goodwill because it had concluded "that it will be unable to recover its investment in long-lived assets in the long-term care services segment."
 
 
 51
 3) In the May 17, 1999, Form 10-Q NovaCare also disclosed that it was considering abandoning the long-term care services business entirely.
 
 
 52
 4) On May 28, 1999, NovaCare issued a press release disclosing that it had agreed to sell the entire long-term care services business to Chance Murphy "for a nominal amount."
 
 
 53
 NAHC Appellees' Brief at 34-35.
 
 
 54
 Thus, the district court concluded, that by June 16, 1999, when NovaCare completed the sale of its long-term care services business for nominal consideration, Appellants, as reasonable stockholders, "were at least on inquiry notice of their claims ... and, in the exercise of reasonable diligence, should have discovered the basis for the claims within one year." D. Ct. Op. at 18. The district court is correct in its analysis. Appellants conceded in their Complaint: "By April 1999, the financial markets had discounted the long-term care services segment entirely, and Novacare [sic] common stock reflected the valuation of Novacare's [sic] other lines of business." App. at 111. This, coupled with NovaCare's repeated disclosures that it was writing off the goodwill and selling the business for nominal consideration, constituted "`storm warnings' sufficient to place [Appellants] on inquiry notice that the previous valuations of goodwill had been overstated in derogation of GAAP." D. Ct. Op. at 18.
 
 
 55
 Once the existence of storm warnings has been adequately established "the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." Mathews, 260 F.3d at 252. If plaintiffs do not investigate the storm warnings, they are "deem[ed] ... on inquiry notice of their claims." Id. at n. 16. Appellants did not allege any facts in their Complaint to show why, in the exercise of due diligence, they could not have discovered the overstatement of goodwill prior to September 19, 2000. However, they now contend before this court that because NovaCare did not separately report the value of goodwill for each acquisition NovaCare made during its rapid expansion, "[Appellants] could not have been able to assess [Appellees'] failure to record losses in the value of its intangible assets." Appellants' Brief at 39-40.
 
 
 56
 Appellants' argument fails for a number of reasons. First, Appellants allege that the overstatement of goodwill arose from the BBA's impact on NovaCare's entire long-term care services business, not from any particular acquisition. Second, there is no reason to believe that if Appellees individually recorded the writing-off of goodwill of individual acquisitions, the problem would have been disclosed to Appellants any sooner. NovaCare wrote off all long-term care services goodwill in May 1999. Third, Appellants' claim is seriously undermined by their own admission that the financial markets had discounted the long-term care services business entirely by April 1999. Finally, Appellants cannot bolster their cause by arguing the difficulty of discovering the alleged fraud. This court has previously held that "excus[ing] Appellant's lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury ... would, in effect, discourage investigation...." Mathews, 260 F.3d at 252 n. 16.
 
 3.
 
 57
 Therefore, because the claim regarding the overstatement of the long-term care services' goodwill was not asserted until September 19, 2000, this action was not commenced within the one-year limitations period. Consequently, the district court did not err in dismissing Appellants' BBA-related claims as time-barred.
 
 V.
 
 58
 Appellants contend also that the district court erred when it: (1) dismissed Appellants' remaining § 10(b) allegations against NovaCare for failure to state a claim; (2) dismissed Appellants' § 14(a) claims against NovaCare for failure to demonstrate materiality and transactional causation; (3) dismissed Appellants' § 10(b) claims against PricewaterhouseCoopers LLP because they were time-barred and they failed to allege any material misrepresentations in their statements; (4) dismissed Appellants' § 10(b) and § 14(a) claims against Wasserstein Perella & Co., Inc. because any alleged misrepresentation was immaterial as a matter of law; (5) improperly took judicial notice of certain documents filed during the relevant period; and (6) abused its discretion in denying Appellants leave to amend.
 
 A.
 
 59
 The district court did not err in dismissing Appellants' remaining § 10(b) allegations against the NovaCare Appellees for failure to state a claim.
 
 
 60
 To state a valid securities fraud claim under Rule 10b-5, a plaintiff must first establish that defendant, in connection with the purchase or sale of a security, "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir.1997). The plaintiff must additionally establish that the defendant acted with scienter and that plaintiff's reasonable reliance on defendant's misstatement proximately caused him injury. See In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989).
 
 
 61
 Oran v. Stafford, 226 F.3d 275, 282 (3d Cir.2000).
 
 
 62
 In addition, a party asserting a claim under the federal securities laws must meet the heightened pleading standard set forth under the PSLRA, enacted in 1997 to restrict abuses in securities class-action litigation. First, the PSLRA requires a party alleging a Rule 10b-5 violation to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." In re Advanta Corp. Sec. Litig., 180 F.3d 525, 530 (3d Cir.1999) (quoting 15 U.S.C. § 78u-4(b)(1)). Second, the PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at 531-532 (quoting 15 U.S.C. § 78u-4(b)(2)).
 
 
 63
 Appellants initially attempt to attack the district court's dismissal of their § 10(b) claims by arguing that the court applied too stringent a standard when reviewing their allegations. Appellants contend that Rule 9(b), Federal Rules of Civil Procedure requires that a "`relaxed' pleading standard applies to securities fraud actions brought under the PSLRA." Appellants' Brief at 42. We do not agree.
 
 
 64
 We have recognized that "[c]omplaints alleging securities fraud must also comply with Rule 9(b), which provides: `In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" Advanta, 180 F.3d at 531 (quoting Rule 9(b), Federal Rules of Civil Procedure).
 
 
 65
 We have held that "Rule 9(b)'s provision allowing state of mind to be averred generally conflicts with the Reform Act's requirement that plaintiffs `state with particularity facts giving rise to a strong inference' of scienter ... In that sense, we believe the Reform Act supersedes Rule 9(b) as it relates to Rule 10b-5 actions." Id. at n. 5 (internal citations omitted). The standard applied by the district court here was correct.
 
 
 66
 In an extremely thorough discussion, the district court dismissed Appellants' § 10(b) claims against NovaCare. We accept the reasoning and conclusion set forth in its opinion. D. Ct. Op. at 12-28.
 
 B.
 
 67
 In addition to their Rule 10b-5 contentions, Appellants' argue that the proxy materials distributed by the NovaCare Appellees on August 13, 1999, and September 10, 1999, violated § 14(a) and Rule 14a-9 because they had misrepresented the liquidation values of NovaCare. They further allege that the proxy materials failed to disclose fully the extent of bonuses that the Company executives had negotiated for themselves.
 
 
 68
 Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides, in pertinent part that:
 
 
 69
 No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time ... it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...
 
 
 70
 17 C.F.R. § 240.14a-9.
 
 
 71
 "To prevail on a § 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was `an essential link in the accomplishment of the transaction.'" Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir.1992) (citing Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)).
 
 
 72
 Here, too, we agree with the district court's reasoning set forth in its opinion and its conclusion:
 
 
 73
 Under the heightened pleading standard of the PSLRA, the complaint in a Section 14(a) action must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed. See 15 U.S.C. § 78u-4(b)(1). As explained above, plaintiffs have failed to allege particularized facts to support the allegation that the statements regarding the following issues were materially false when the NovaCare defendants issued the proxy materials: (1) the O & P divestiture; (2) the divestiture of the Company's long-term care services division; (3) the NCES divestiture; and (4) the PROH divestiture. Thus, I conclude that the plaintiffs' Section 14(a) claims with regard to these issues will be dismissed.
 
 
 74
 D. Ct. Op. at 39.
 
 C.
 
 75
 In addition to their claim against the NovaCare Appellees, Appellants assert Rule 10b-5 claims against PwC which allege that: (1) PwC failed to reassess the long-term care services goodwill in NovaCare's 1998 Form 10-K and the goodwill of the company in NovaCare's 1999 Form 10-K as required under GAAP and generally accepted auditing standards ("GAAS"); and (2) PwC issued an unqualified audit report for the 1998 and 1999 Forms 10-K that were materially false and misleading. Both of these allegations were properly dismissed.
 
 
 76
 Considering Appellants' claim regarding the 1998 10-K, under an inquiry notice standard, Appellants, as reasonable stockholders "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the PwC Appellees by June 16, 1999, when NovaCare filed a Form 8-K announcing the completion of the sale of the long-term care services business for nominal consideration. See Gruber v. Price Waterhouse, 697 F.Supp. 859, 863 (E.D.Pa.1988). For the same reasons as discussed earlier, because the claim regarding the overstatement of goodwill in the 1998 Form 10-K was not asserted until September 19, 2000, it is time-barred pursuant to the one-year statute of limitations for securities fraud claims.
 
 
 77
 Appellants' claim regarding the alleged misstatement of goodwill in the 1999 Form 10-K was also properly dismissed. As previously mentioned, under § 10(b), a private cause of action arises when purchasers or sellers can identify a false representation of material fact or omission that makes a disclosed statement materially misleading. Burlington, 114 F.3d at 1419. However, a fact or omission is material only if "there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the `total mix' of information" available to the investor. Basic Inc. v. Levinson, 485 U.S. 224, 231-232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The proxy materials filed with the SEC on August 13, 1999, disclosed the impact of the proposed liquidation of the company. This disclosure rendered immaterial any subsequent misstatement regarding the goodwill of the company in the 1999 Form 10-K because it did not alter the "total mix of information available" to Appellants. The district court did not err in dismissing Appellants' claims against PwC.
 
 D.
 
 78
 Appellants also assert § 10(b) and § 14(a) claims against Wasserstein which allege that Wasserstein fraudulently omitted material information regarding the loss of the $13.4 million escrow for the NCES employment guarantee from the opinion letter included in the proxy materials dated September 10, 1999. Again, this claim was properly dismissed by the district court.
 
 
 79
 To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. In re Nice Sys., Ltd. Sec. Litig., 135 F.Supp.2d 551, 586 (D.N.J.2001). Appellees are not obligated to predict future events unless there is reason to believe that they will occur. Zucker v. Quasha, 891 F.Supp. 1010, 1017 (D.N.J.1995). The eventual loss of the NCES escrow occurred after the PROH sale was completed on November 19, 1999. Therefore, insofar as Appellants' claims are based on events that took place after Wasserstein's allegedly fraudulent statements, they are not actionable for securities fraud. Wasserstein cannot be held liable for not disclosing a loss that had not yet occurred.
 
 
 80
 Thus, we must turn to the contention that Wasserstein failed to disclose that the Company was required to escrow $13.4 million of the NCES proceeds to support the guarantee for the employment contract with PROH. The Wasserstein Appellees argue that this claim was properly dismissed because it is immaterial as a matter of law.
 
 
 81
 "In ... an `efficient' market, the concept of materiality translates into information that alters the price of the firm's stock." Burlington, 114 F.3d at 1425. If the disclosure of certain information has no effect on stock prices, it follows that the information disclosed was immaterial as a matter of law. Id. As previously discussed, the need to escrow $13.4 million was disclosed November 2, 1999, in the SEC Form 8-K. According to the Dow Jones Interactive Quotes and Data Market, this disclosure had no negative effect whatsoever on the price of NovaCare stock on or immediately following November 2, 1999. App. at 1385. Accordingly, the district court was correct in dismissing Appellants' claim that Wasserstein's delay in releasing statements regarding the need to escrow $13.4 million was materially misleading.
 
 
 82
 Appellants further argue that even if their Rule 10b-5 claims against the Wasserstein Appellees are deemed immaterial, their § 14(a) claims are not precluded because the test for materiality under § 14(a) is different than that for § 10(b). Appellants are mistaken. Information is deemed material for purposes of a § 14(a) claim "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The test for materiality is whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." Id. This definition of materiality is the same for both § 10(b) and § 14(a) claims. See Basic, 485 U.S. at 231-232, 108 S.Ct. 978 (adopting TSC standard for Rule 10b-5 claim). Consequently, in light of the foregoing information, the district court was correct in dismissing Appellants' § 10(b) and § 14(a) claims against Wasserstein.
 
 E.
 
 83
 Appellants additionally argue that the district court erred in taking judicial notice of certain documents during the prior proceedings. Although this is Appellants' principal argument, it warrants only cursory consideration. The district court took judicial notice of three different categories of documents at the urging of the NovaCare Appellees in support of their motion to dismiss. The relevant documents included: (1) documents relied upon in the Complaint (thirty-two documents, comprising Company SEC filings and press releases); (2) documents filed with the SEC, but not relied upon in the Complaint (seven documents); and (3) stock price data compiled by the Dow Jones news service (two exhibits, including a printout of the historical prices of NovaCare stock and a corresponding graph).
 
 
 84
 Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b). Under Rule 201(d), Federal Rules of Evidence, a district court must take judicial notice "if requested by a party and supplied with the necessary information." Rule 201(d).
 
 
 85
 As was correctly pointed out by the district court, prior decisions of this court sufficiently support judicial notice of the three categories of documents urged by the NovaCare Appellees in this case. See, e.g., Burlington, 114 F.3d at 1426 (court may consider a document "integral to or explicitly relied upon in the complaint" on motion to dismiss); Oran, 226 F.3d at 289 (taking judicial notice of properly-authenticated public disclosure documents filed with SEC); Ieradi v. Mylan Lab., Inc., 230 F.3d 594, 600 n. 3 (3d Cir.2000) (taking judicial notice of stock prices reported by Quotron Chart Services).
 
 
 86
 On appeal, Appellants concede that the district court was entitled to take judicial notice of the aforementioned documents to ascertain their contents. However, they contend that the district court erred by accepting "for the truth of the matter asserted" certain statements in NovaCare's Proxy Statement filed with the SEC on August 13, 1999, and in its Quarterly Report (Form 10-Q) filed with the SEC on November 22, 1999. Appellants' Brief at 32-34.
 
 
 87
 We find no reversible error and completely accept the district court's discussion of this particular issue and all aspects of the judicial notice contention. D. Ct. Op. at 9-12.
 
 F.
 
 88
 Finally, Appellants challenge, as an abuse of discretion, the district court's decision to dismiss the Complaint with prejudice and to deny Appellants' request for leave to amend. Appellants maintain that under Rule 15(a), Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." Burlington, 114 F.3d at 1434 (citing Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir.1996)). Appellants are correct in noting that normally, leave to amend is granted when a complaint is dismissed on Rule 9(b) "failure to plead with particularity grounds." Id. at 1435. However, leave to replead is often denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice and futility. Id. at 1434.
 
 
 89
 This case presents a situation in which amendment of the Complaint would be futile. We have made it clear that an amendment would be futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." Id; see also Oran, 226 F.3d at 291 (affirming the district court's denial of leave to amend because of futility of amendment); Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 188-189 (3d Cir.2000) (upholding district court's denial of leave to amend because it found that "it would be futile to amend the complaint to include a meritless claim").
 
 
 90
 Many claims asserted by Appellants would obviously be futile to amend. The claim alleging overstatement of goodwill in the 1998 Form 10-K is time-barred under the statute of limitations. The claims regarding the need for the NCES escrow and the overstatement of goodwill in the 1999 Form 10-K will not survive a Rule 12(b)(6) motion even if the claims had been made with more particularity. In its opinion, the district court noted that Appellants had made "no representation as to any new information that [they] might have received since filing the Complaint, nor did they provide proposed amendments or specific facts that would cure the Complaint's pleading deficiencies." D. Ct. Op. at 47; see also Confederate Mem'l Ass'n v. Hines, 995 F.2d 295, 299 (D.C.Cir. 1993) ("[A] bare request in an opposition to a motion to dismiss — without any indication of the particular grounds on which amendment is sought ... does not constitute a motion within the contemplation of Rule 15(a)"). Before this court, Appellants again do not specify what additional facts, if any, they would plead if given another opportunity to amend their Complaint.
 
 
 91
 Moreover, the district court adopted the reasoning of In re Champion Enters., Inc., Sec. Litig., 145 F.Supp.2d 871 (E.D.Mich. 2001), in which the court concluded that the PSLRA limits the application of Federal Rule of Civil Procedure 15 in securities fraud cases. As the district court recognized, some factual distinctions exist between Champion Enters. and the case at bar; however, the underlying policy considerations apply equally to both situations. The district court noted:
 
 
 92
 The PSLRA's stay of discovery procedures was intended by Congress to protect innocent defendants from having to pay nuisance settlements in securities fraud actions in which a foundation for the suit cannot be pleaded; rather than lead to the conclusion that plaintiffs should receive more leniency in amending their pleadings, the stay of discovery procedures adopted in conjunction with the heightened pleading standards under the PSLRA is a reflection of the objective of Congress "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." [Champion Enters., 145 F.Supp.2d] at 874 (quoting Selected Bill Provisions of the Conference Report to H.R. 1058/§ 240, 141 Cong. Rec. § 19152 (daily ed. Dec. 22, 1995)). This objective would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again; this is particularly true where, as here, there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA.
 
 
 93
 D. Ct. Op. at 48.
 
 
 94
 Based on the foregoing considerations, we conclude that the district court did not abuse its discretion in denying Appellants leave to amend their deficient Complaint.
 
 
 95
 * * * * * *
 
 
 96
 We have considered all contentions presented by the parties and conclude that no further discussion is necessary.
 
 
 97
 The judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Jack Brady, Roger W. Svec, Jacob A. Salzmann, David Fisher, Chris Pietrafitta, Frank J. Siefert, Franz Schleicher, Barry Weisberg and Bruce Bardone
 
 
 [2]
 Appellants' original Complaint was extremely convoluted. However, the district court did an outstanding job of organizing the varied, haphazard claims into a coherent, intelligible structure:
 Count I of the Complaint asserts Rule 10b-5 claims against the NovaCare Defendants. The plaintiffs allege that the NovaCare Defendants engaged in a course of conduct from May 20, 1998, to November 22, 1999, in which they knowingly or recklessly issued materially false and misleading financial statements and failed to disclose significant terms of various asset sales in order to artificially inflate and maintain the price of NovaCare common stock.
 Although allegations of the misrepresentations are strewn throughout the Complaint, for purposes of convenience and clarity, and as guided by the motion papers and responses of the parties, I will categorize the claims brought against the NovaCare Defendants in Count I of the Complaint into the following six groups:
 Claim (A): failure to adjust the goodwill of the long-term care services division in light of the BBA's impact;
 Claim (B): failure to disclose that proceeds from the sale of the O & P division would be reduced because of overstated working capital;
 Claim (C): failure to disclose that proceeds from the sale of the long-term care division would be reduced because of (i) overstated working capital and (ii) uncollectible accounts receivable;
 Claim (D): failure to disclose that proceeds from the sale of the NCES division would be reduced because (i) the purchaser of PROH would not enter into an employment services contract with NCES, nor assume the Company's guarantee of the contract; and (ii) NovaCare had placed funds in escrow to support the guarantee of the employment services contract;
 Claim (E): failure to disclose that proceeds from the sale of the PROH division would be materially reduced because (i) the Company would lose the funds escrowed in support of the financial representations in the sales agreement due to the overstatement of the PROH working capital and accounts receivable, and (ii) the Company would place $36 million in escrow in support of the financial representations and would incur $26 million in transactions costs and liabilities; and
 Claim (F): failure to adjust the Company's goodwill despite the planned sale of all operating assets under the Restructuring Plan.
 Count II of the Complaint asserts Rule 10b-5 claims against PwC. The plaintiffs claim that PwC issued materially false and misleading audit reports for NovaCare's 1998 and 1999 Forms 10-K.
 Count III of the Complaint asserts Rule 10b-5 claims against Wasserstein for issuing a materially false and misleading fairness opinion regarding the NCES transaction in the proxy materials.
 Count IV of the Complaint asserts Section 20(a) claims against the Individual Defendants, as control persons of the Company during the time of the alleged underlying violations of Rule 10b-5 and Rule 14a-9.
 Count V of the Complaint asserts Rule 14a-9 claims against all of the defendants except PwC for issuing proxy materials with materially false or misleading statements regarding Claims (B) through (E) of Count I of the Complaint as listed above.
 D. Ct. Op. at 7-8 (internal citations omitted).
 
 
 [3]
 Appellants do not dispute that September 19, 2000, is the appropriate date from which to measure the statute of limitations
 
 
 [4]
 See Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir.2000) ("[W]e conclude that whether the [plaintiffs'] claim against[defendant] is time-barred turns on when, after obtaining inquiry notice ..., the [plaintiffs], in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud...."); Sterlin v. Biomune Sys., Inc., 154 F.3d 1191, 1199-1201 (10th Cir.1998); Great Rivers Coop. v. Farmland Indus., Inc., 120 F.3d 893, 896 (8th Cir.1997) ("Inquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations."); Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir.1997) ("[I]nquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit."); Caviness v. DeRand Res. Corp., 983 F.2d 1295, 1303 (4th Cir.1993) ("[§ 13] provides for the commencement of the one-year limitations period when the plaintiff knows of the facts on which the action is based or has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based."); Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir.1993) ("[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry."); Rosen v. Comm. Servs. Group, Inc., 155 F.Supp.2d 310 (E.D.Pa.2001); Leach v. Quality Health Servs., 902 F.Supp. 554, 557 (E.D.Pa.1995).
 
 
 [5]
 As theMathews court recognized:
 [S]torm warnings may take numerous forms, and we will not attempt to provide an exhaustive list. They may include, however, substantial conflicts between oral representations of the brokers and the text of the prospectus, ... the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.
 Mathews, 260 F.3d at 252 (internal citations and quotations omitted).